SARAH JANE GRIFFIN v. MINNESOTA TRANSFER RAILWAY COM-
PANY.[1]

February 3, 1905.

Nos. 14,189—(212).

**Evidence of Negligence.**

Plaintiff's intestate was killed while riding two loaded gondola cars which had been kicked to a switch track from a train on the lead track for the purpose of coupling them with other loaded cars upon the switch track. The cars were driven with greater force than necessary to send them to the desired point, and the deceased was found lying upon the track underneath, and about six feet from the end of, the car he was riding. There was no evidence that the cars were delivered with unusual force, or ran at an unusual speed, and there was no evidence of injury to the cars coupled.

*Held,* the evidence was not sufficient to justify the inference that the switchman met his death because of any negligent acts on the part of defendant.

Action in the district court for Ramsey county by plaintiff, as administrator of the estate of William H. Griffin, deceased, to recover $5,000 for the death of decedent. The case was tried before Kelly, J., and a jury, which rendered a verdict in favor of plaintiff for $4,550. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Reversed and judgment ordered for defendant.

*W. H. Norris* and *F. W. Root,* for appellant.
*Oscar Hallam* and *C. L. Caldwell,* for respondent.

[1] Reported in 102 N. W. 391.

LEWIS, J.

Plaintiff's intestate was killed March 16, 1903, while switching loaded freight cars from incoming and outgoing trains in defendant's yards at the Minnesota Transfer, which contains a large number of tracks, and each yard has its own lead track, with numerous switch tracks branching off first at an angle and then running parallel. Deceased was working with a crew of men under a foreman in the "B" yard, where the tracks were on a slight grade to the north. The crew consisted of the foreman, fireman, engineer of the switching engine, and two switchmen, one of whom was Griffin, the deceased. There were thirteen tracks, numbered consecutively. At the time of the accident Griffin was assisting in switching two gondola cars that had been detached from a train of about twelve cars on the lead track and switched to track No. 13, the most northerly in that yard, it being the intention to couple them with a bunch of six loaded box cars standing on track No. 13. When last seen, Griffin was standing on the north end of the north gondola car, having hold of the brake. Half an hour later he was missed, and when found the gondola cars were coupled to the box cars and Griffin lay dead under the gondola car on which he had been riding, his body lying diagonally between the rails at a point about six feet from the end of the car, just past the forward trucks. His neck was broken, but there were no other marks upon his body except an abrasion on one cheek. Between the gondola car and the box cars to which it was coupled was a space two and one half feet wide. A light rain had fallen for an hour or two, and the tracks were wet, though not frozen. The gondola cars were loaded with what is known as "angle iron." Everything was found intact about the coupling and the brake. There was nothing to indicate a violent collision, and the brake was not set.

On this occasion the foreman had ordered what is known as a "double cut," the engine upon the lead track moving back with sufficient force so that the momentum of uncoupled cars, when the train was slackened, would be sufficient to carry the gondola cars upon switch track No. 13, and at the same time carry other cars upon No. 11; the other switchmen in the meantime operating the switch at track No. 11. In order to make this double cut, it was necessary to move the train a little faster than required to make a single cut. Griffin had

worked at the transfer as a switchman or helper for about three months, and had been at work in this particular yard about thirty days. A gondola car is a flat car, with side boards a little over two feet high, with a projecting platform about eighteen inches at each end of the car, outside of the sideboards. The brake staff, as the car was moving, was on the front end of this platform on the east side of the drawbar. When the cars were first examined after the discovery of the accident, a rough stone six or seven inches in diameter at one end and tapering towards the other end was found upon the platform to the west of the brake staff. The brake was operated in the ordinary manner by setting the foot against a ratchet, and with the hands turning a wheel at the top. The cars were equipped with automatic couplings, which would not couple unless one or both of the knuckles were open, which it was the duty of the switchmen to see were open in order to effect a coupling. On box cars it was the practice to get down on the ground and open the knuckles of the standing car, but in case the switchman was riding a flat or gondola car he frequently reached down with a stick and opened the knuckle.

The trial resulted in a verdict for plaintiff, and appeal was taken from an order of the court denying defendant's motion for judgment notwithstanding the verdict, or for a new trial.

The various acts of negligence charged to defendant were that its foreman was negligent, under all the circumstances, in making the so-called "double cut"; that the foreman and engineer were negligent in kicking the gondola cars harder than was usual or necessary; that Griffin's death was caused by the unusual and severe concussion of the cars when coupling; that defendant was negligent in allowing the stone to remain on the narrow platform or ledge on which Griffin was obliged to stand and work in setting the brake. On the other hand, it was submitted on behalf of defendant that it conclusively appeared from the evidence that, whatever may have been the cause of Griffin's death, it was not occasioned by any negligence on the part of defendant.

Two theories are advanced to account for this unfortunate accident. By plaintiff: That there was evidence tending to show Griffin was a green hand, with no knowledge of the practice of making double cuts, and that upon this occasion the momentum given the gondola cars was of such force that he was unable to control them by means of the

brake, and that they ran at an unusual rate of speed, striking the six loaded box cars with such force as to hurl him to the ground, and carry the box cars, including the gondolas, for a distance of six or seven feet, thus running over him. On the other hand, it is claimed by defendant that the following is the more reasonable theory and is supported by the evidence: That making double cuts was an everyday occurrence; that Griffin knew it was being made on this occasion; that the cars were not proceeding at an unusual and unnecessary speed; that they were entirely under his control; and that he probably lost his balance while endeavoring to open the knuckle of the coupler with the stick, and so fell under the forward end of the gondola car on which he was riding, at a point six or seven feet before it reached and coupled with the box cars.

The question was submitted to the jury by the trial court, and the court refused to disturb their verdict upon the ground that they were warranted in drawing the inference from the circumstances, that Griffin met his death by reason of the negligent acts of defendant in making the double cut and in sending the gondola cars down the lead track at an unusual and unnecessary rate of speed, which Griffin was not required to and did not anticipate, but was killed while in the exercise of his duties as a switchman, endeavoring to control the cars.

While defendant presents a theory claimed to be the most reasonable to account for the accident, its acceptance is not necessary in order to release defendant from the imputation of negligence. The switchman may have met his death in some entirely different manner, and it is only essential to determine whether it was caused by the negligent acts of defendant. The foreman, who was called as a witness on behalf of plaintiff, testified that it was customary to make double cuts whenever opportunity afforded, and that on this occasion the two gondola cars were kicked off harder than they would have been for a single cut; that he did not know exactly where the box cars were standing on No. 13, and could not see them on account of cars on track No. 12, and that, if he had known just where the cars on No. 13 were located, he would not have kicked the gondola cars as hard as he did; but he further testified that the two cars were entirely under the control of the switchman, and could have been slowed down by him to the proper speed necessary to make the coupling. He also testified that,

track No. 13 being on a downgrade, the gondola cars would have gradually acquired greater speed after leaving the curve, unless controlled by the brake, and all that was necessary was to send them along the lead track and around the curve onto the switch track so that by their momentum they would reach the intended place, the cars being all the time under the control of the switchman, whose specific duty it was to operate the brake, regulate the speed, and stop the cars where desired.

The only evidence in the case to indicate that on this particular occasion the cars were kicked off harder than necessary is the statement of the foreman that, had he known exactly where the box cars on No. 13 were, he would not have kicked quite as hard as he did. This statement is somewhat in conflict with his previous statement to the effect that the track was slightly downgrade, and, if the cars kicked off were given sufficient momentum to pass the curve, they would of themselves acquire sufficient speed to make the intended coupling. However, there is nothing in the case to indicate that the rate of speed, although more than necessary to accomplish the particular object on this occasion, was greater than could be controlled by the switchman in charge, and, so far as appears, the speed was no more than customarily given such cars in making double cuts. In conducting such switching operations the foreman could not be required to judge with precise accuracy the location of the cars he desired to couple with, and the exact momentum needed. True, unusual and unexpected impetus given cars upon such occasions might take switchmen and brakemen unaware, and render the company liable, but there is no evidence to that effect in this case. When last seen, Griffin was at his post. There was nothing unusual in the speed of the cars or his actions to attract the attention of those whom he passed, and, although the rails were wet, there was nothing to indicate that he was prevented from performing his duty in controlling the cars and regulating the speed to that required for the coupling, except the fact that he was found under the forward trucks of the car he was riding, and that, as already stated, the cars were sent off with more speed than necessary to reach the box cars.

The evidence does not disclose whether Griffin had been employed in making double cuts, but it is conclusive that the making of double cuts was of daily occurrence in that yard during his employment there.

There is no evidence to suggest that he was unacquainted with the duties he was performing, and did not fully understand how to apply brakes and make couplings, except the mere statement of the foreman that he appeared green and awkward. There is no evidence that the six loaded box cars on No. 13 were moved by impact, except the inference drawn from the position of Griffin's body. It must be assumed, under the evidence, that the switchman was in the performance of his duty, and reduced the speed of the car he was riding sufficiently to avoid such a violent concussion as to cause the accident in the manner claimed by plaintiff.

The stone found upon the ledge of the car was not shown to have any connection with the accident, and to our minds the conclusion reached by the jury is based upon pure conjecture, having no foundation in the evidence. It will probably never be known exactly how this man met his death, but, in order to charge defendant with negligence in contributing to it, something more tangible was required than the mere fact that his body was found in the position stated, and that the cars were kicked off at a greater speed than necessary on that particular occasion.

It is evident that all available light has been thrown upon the incident, and that a new trial would be of no avail. It is therefore ordered that the order appealed from be reversed, and that judgment be entered in favor of defendant.